## IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
March 26, 2024 Session

## STATE OF TENNESSEE v. LANDON HANK BLACK

**Appeal from the Criminal Court for Knox County**
**No. 119789   Steven Wayne Sword, Judge**

_____

### No. E2022-01741-CCA-R3-CD
_____

The Defendant, Landon Hank Black, was convicted in the Knox County Criminal Court of second degree murder and unlawful possession of a firearm by a convicted felon and received an effective sentence of twenty-five years in confinement.  On appeal, the Defendant contends that the State infringed on his right to remain silent; the trial court erred by allowing a State witness to give opinion testimony but then prohibiting a defense witness from doing the same; the trial court erred by allowing a State witness to testify that she had sex with the Defendant just days after the victim's death; the State was allowed to attack the integrity of the defense during the presentation of the evidence; the State's closing arguments were improper; the trial court erred by instructing the jury that the Defendant had a duty to retreat before acting in self-defense; the trial court erred by refusing to give a modified sequential jury instruction; the trial court incorrectly instructed the jury on voluntary manslaughter; and the cumulative effect of the errors requires a new trial.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and MATTHEW J. WILSON, JJ., joined.

Eric M. Lutton and Jonathan Harwell (on appeal) and Don Bosch, Chloe Akers, and Ann Short (at trial), Knoxville, Tennessee, for the appellant, Landon Hank Black.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Kevin Allen and Joanie Stewart, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

# FACTS

This case relates to the Defendant's shooting and killing thirty-year-old Brandon Lee in the parking lot of Billiards and Brews in Knoxville on December 27, 2020. The Defendant fled the scene, and law enforcement arrested him in Los Angeles, where he resided, on January 28, 2021. In September 2021, the Knox County Grand Jury returned a superseding presentment, charging the Defendant with first degree premeditated murder and possession of a firearm after having been convicted of a violent felony, a Class B felony. The Defendant filed a motion to sever the offenses, which the trial court granted, and the Defendant went to trial on the murder charge in October 2021. At trial, the Defendant did not contest that he shot the victim but argued that he did so in self-defense because the victim approached his car with a gun. The jury convicted the Defendant of the lesser-included offense of second degree murder, and he pled guilty to possession of a weapon by a convicted felon, a Class E felony. Although the Defendant does not contest the sufficiency of the evidence, we will summarize the proof presented at trial in order to address the issues raised.

Late on the night of December 26 and into the early morning hours of December 27, 2020, Billiards and Brews sports bar was open for business despite a 10:00 p.m. curfew that the City of Knoxville had implemented due to the Covid pandemic. Three groups of people relevant to this case were drinking and socializing in the bar. The first group consisted of the Defendant; his cousin, Taylor Hodge; and Mr. Hodge's girlfriend, Carrie Phillips. The second group consisted of the victim; his two friends, Chandler Jackson and Clark Longmire; Mr. Jackson's girlfriend, Mallory Hayes; Mr. Hodge's ex-girlfriend, Kelsey Murrell; and Kelsey Murrell's sister, Kaitlyn Murrell. The third group consisted of Alan Ford and two unidentified males who were with him.

Beth Tremaine, the victim's mother, testified that the victim was born and raised in Iowa. In December 2020, the victim lived in Knoxville, owned his own home, and worked as a machinist. He was left-handed and owned a Chevrolet pickup truck with "remote start," meaning he could start the engine by pushing a button on the key fob. The victim always clipped his key fob to a belt loop on the right side of his pants, and his truck's headlights and taillights would flash twice when he started his truck remotely. The victim owned a .45-caliber handgun and would put the gun on a nightstand in his bedroom at night. After the victim's death, Mrs. Tremaine found the gun on the nightstand. On cross-examination, Mrs. Tremaine testified that she also knew the victim to keep the gun in the driver's door pocket of his truck. Mrs. Tremaine identified photographs of the victim's gun, and the State introduced the photographs into evidence.

Neil Tremaine, the victim's stepfather and Mrs. Tremaine's husband, testified that he was present when his wife found the victim's .45-caliber handgun. A "fully loaded" magazine was in the gun; a round of ammunition was not in the gun's chamber. A gun

case also was on the nightstand. The gun case was designed to carry the victim's handgun and two magazines, but the Tremaines found only the magazine that was in the gun.

Investigator Thomas Thurman of the Knoxville Police Department (KPD) testified that in the early morning hours of December 27, 2020, he was alerted to a shooting in the Billiards and Brews parking lot and went to the scene. By the time he arrived, the victim had been transported to a hospital. The shooter was not present, and witnesses did not know the shooter's name. Some of the witnesses "seemed reluctant" to give Investigator Thurman information. He obtained video of the parking lot from cameras on adjacent buildings, and the video appeared to show the male occupant of a silver Ford Fusion shoot the victim and drive away. The Fusion was distinctive because it had stickers on the rear window and damage to the passenger side of the rear bumper.

Investigator Thurman testified that he also reviewed video from cameras inside the bar and spoke with bartenders. One of the bartenders identified a woman in the video as Kelsey Murrell. From speaking with Kelsey,[1] Investigator Thurman learned the names of two men in the video: Taylor Hodge and the Defendant. Mr. Hodge lived in Pennsylvania, and the Defendant lived in California. However, both of them were in Knoxville for the Christmas holidays. Mr. Hodge owned a silver Ford Fusion, but video of the parking lot showed him standing outside the bar at the time of the shooting. On January 5, 2021, Investigator Thurman traveled to Pennsylvania to speak with Mr. Hodge and to inspect his car. Mr. Hodge's Fusion matched the car in the video, and Mr. Hodge told Investigator Thurman that the Defendant had been driving the car on the night of the shooting. Based on that information, Investigator Thurman sought an arrest warrant for the Defendant for first degree murder. The next day, as Investigator Thurman was driving back to Knoxville, he learned that the Defendant had not been located and that the Defendant's cellular telephone had been "shut off."

The State played video showing what occurred inside the bar while Investigator Thurman narrated the video for the jury. Investigator Thurman testified as follows: About 1:20 a.m., Kelsey and the victim were together near the dartboards. They then walked to the "barkeep area," and "[t]here appear[ed] to be . . . some intimate contact" between them. The Defendant, Mr. Hodge, and Ms. Phillips were standing nearby. At 1:30 a.m., Kelsey "kind of points her finger over towards Mr. Hodge," and the victim turned his head to look in Mr. Hodge's direction. Kelsey and the victim then returned to the dartboards. By 2:06 a.m., Kelsey and the victim were back in the barkeep area, and the victim and Mr. Hodge were standing "back to back." At 2:07 a.m., the Defendant, who had been sitting at a table, got up from the table and walked over to the victim and Kelsey. The Defendant stood between them and Mr. Hodge. About forty seconds later, there was "an interaction" between Kelsey and Ms. Phillips. Kelsey's sister, Kaitlyn, came into view and "trie[d] to

---

[1] Because Kelsey and Kaitlyn Murrell share a surname, we will refer to them by their first names for clarity. We mean no disrespect to the witnesses.

get ahold" of Kelsey. The victim left the barkeep area and returned to the dartboards, but Kelsey remained in the barkeep area with the Defendant, Mr. Hodge, and Ms. Phillips. At 2:10 a.m., Kelsey had "physical contact" with the Defendant.[2] Alan Ford "appear[ed] to take notice of what's going on" between Kelsey and the Defendant, moved toward them, and had a "face to face" confrontation with the Defendant. There also was "physical contact" between Mr. Ford and the Defendant. At 2:11 a.m., Kelsey and Kaitlyn exited the bar through the front door. Meanwhile, a bartender intervened in the altercation between the Defendant and Mr. Ford and separated them. At 2:13 a.m., Mr. Ford exited the bar through the front door, and the Defendant exited the bar through an emergency exit. Twenty seconds later, Mr. Jackson and Ms. Hayes left through the front door, followed by the victim. Mr. Hodge exited the front door at 2:14 a.m.

Next, the State played video showing the parking lot as everyone was leaving the bar, and Investigator Thurman testified as follows: Mr. Ford's group exited the front door and stopped in the parking lot while the Defendant exited a separate door and walked out of view. The victim's group exited the front door, walked past Mr. Ford's group, and walked toward the victim's pickup truck. The victim appeared to turn around and walk briefly toward Mr. Ford but then turned back around and continued walking to his truck. Mr. Jackson and Ms. Hayes were walking ahead of the victim, and Mr. Longmire was walking behind the victim. The victim appeared to have something in his right hand, and the lights on his truck appeared to illuminate at 2:19:28 a.m. Investigator Thurman had noticed in the bar video that the keys to the victim's truck appeared to be clasped to a belt loop on the right side of the victim's pants. As the victim was walking, a silver car came into view. The car was traveling away from the bar and appeared to slow down and then speed up. The car rounded a corner and braked suddenly as it encountered the victim. At 2:19:45 a.m., the car came to a full stop with the victim standing in front of the vehicle. The victim walked to the driver's side of the car, was moving his upper body and arms, and stepped toward the driver's door. At 2:19:48 a.m., the muzzle of a gun appeared to flash from the steering wheel area. At the time of the flash, the driver's tinted window was down, and the victim's arms appeared to be down at his sides. The victim fell to the ground, and the car traveled toward the bar. The car passed Mr. Ford's group, and a woman appeared to shove Mr. Ford. The car stopped briefly in front of the bar, and Mr. Hodge appeared to be standing at the driver's door. The car then left the parking lot.

Investigator Thurman testified that the police found the victim's keys and a .40-caliber spent cartridge case on the pavement in the parking lot. They found a fully-loaded magazine for a .45-caliber firearm in the center console of the victim's truck, but none of the witnesses at the scene mentioned a firearm. The police did not find any weapons at the scene, and they never found the gun that was used to shoot the victim. Investigator Thurman later learned from the victim's mother that she found the victim's .45-caliber

---

[2] The video shows that Kelsey pushed the Defendant. She then pushed Mr. Hodge, and the Defendant restrained her.

- 4 -

handgun on the nightstand in his bedroom. On the night of January 6, 2021, Investigator Thurman met with the Defendant's parents and his sister at their home in Knoxville and told them that he wanted the Defendant to turn himself in to the police. On January 28, 2021, Investigator Thurman learned law enforcement had arrested the Defendant in Los Angeles.

On cross-examination, Investigator Thurman acknowledged that the Defendant never interacted with the victim inside Billiards and Brews. Before the victim exited the bar, he appeared to snort a powder substance. Investigator Thurman said that a person who had just ingested cocaine was "usually excitable" and could act "irrational."

Defense counsel showed Investigator Thurman a still photograph of the victim that was taken from the video of the victim walking to his truck. Investigator Thurman acknowledged that the photograph showed an object in the victim's right hand. Defense counsel asked if the victim could have been holding a gun rather than his keys, and Investigator Thurman responded, "I cannot say for sure what it is." Defense counsel introduced the photograph into evidence.

Chandler Jackson testified that he and the victim were close friends. In December 2020, Mr. Jackson was living with the victim. The victim owned a .45-caliber pistol and usually kept the gun in his truck. However, the victim knew not to have the gun with him when he was "going out drinking." If the gun was not in the victim's truck, then it was in his bedroom.

Mr. Jackson testified that on the night of the shooting, he went to Billiards and Brews with the victim, Ms. Hayes, and Mr. Longmire. The victim drove them to the bar in his truck. During the night, Kelsey Murrell began flirting with the victim, and they were "almost hanging over each other." As the bar was closing, Mr. Jackson and Ms. Hayes exited first, followed by the victim. They began walking to the victim's truck, and the victim started the truck remotely. Mr. Jackson and Ms. Hayes arrived at the truck first, and Mr. Jackson "heard a noise." A silver car "went by," and Mr. Jackson saw the victim lying on his back. Mr. Longmire was screaming, and Mr. Jackson ran to the victim. The victim's eyes were open, and he said, "I can't believe this is happening." Mr. Jackson saw that the victim had a bullet wound to his chest, but Mr. Jackson did not see any weapons on the ground. The victim was barely breathing and died before medical help arrived. On cross-examination, Mr. Jackson testified that he had been drinking alcohol, smoking marijuana, and using cocaine that night but that he was not intoxicated.

Clark Longmire testified that he exited the bar with the victim. The outside temperature was below freezing, and ice was on the ground. As the victim and Mr. Longmire were walking to the victim's truck, a car approached them "quickly." The State asked Mr. Longmire to explain what he meant by "quickly," and he said, "Quicker than you should be coming through a parking lot." The driver's front fender almost hit the

victim, so the victim "[threw] his hands up" and said, "Dude, what the [f*ck]?" The victim was standing near the driver's door of the silver car, and Mr. Longmire was standing directly behind him. The victim did not have anything in his hands at that time, and the driver pointed a gun out the window. Mr. Longmire described the weapon as a "Glock-style gun with an extended magazine." The driver fired one shot, and the victim fell to the ground. Mr. Longmire did not see any weapons around the victim. The victim's eyes were open, he was trying to breathe, and he asked, "Is this really happening?"

On cross-examination, Mr. Longmire acknowledged that he snorted cocaine at Billiards and Brews and that he was "pretty intoxicated." Just before the shooting, the victim held his hands out to his sides, not straight up in the air. Defense counsel demonstrated his hands in a "V position" for Mr. Longmire, and Mr. Longmire stated, "Correct." The driver did not say anything to the victim, and Mr. Longmire did not recognize the driver.

Mallory Hayes testified that in December 2020, she was dating Chandler Jackson and was "[c]lose friends" with the victim. Ms. Hayes was at Billiards and Brews with Mr. Jackson, Mr. Longmire, and the victim, and she described the victim's behavior that night as "[n]ormal, calm, happy." Ms. Hayes said that as the four of them were exiting the front door, some "yelling" and "a commotion" occurred in middle of bar. However, they were not involved in the commotion and began walking to the victim's truck. Ms. Hayes and Mr. Jackson were walking ahead of Mr. Longmire and the victim. It was cold outside, so the victim started his truck remotely, and everyone "hurried[]" to the truck. As Ms. Hayes was getting into the back seat, she and Mr. Jackson "heard something." Ms. Hayes saw the victim lying on the ground and saw a silver car driving away. She and Mr. Jackson went to the victim, and Mr. Longmire said the victim had been shot. Ms. Hayes did not see a weapon on the ground, and no one discussed removing a weapon from the scene. On cross-examination, Ms. Hayes testified that she did not know the Defendant and that she did not remember seeing him in the bar.

Twenty-seven-year-old Kelsey Murrell testified that she met Taylor Hodge in Knoxville when she was twenty-one years old and that they began dating. In January 2020, Mr. Hodge moved to Pennsylvania for a new job, and Kelsey moved to Pennsylvania with him. Kelsey moved back to Knoxville in July 2020, and she and Mr. Hodge ended their relationship in November 2020. On the night of December 26, Kelsey went to Billiards and Brews. She met the victim for the first time and was attracted to him. At some point, Kelsey became aware that Mr. Hodge was there with Ms. Phillips. Kelsey had not seen Mr. Hodge since their breakup, and she pointed him out to the victim. The victim told her "to just not worry about it" and to enjoy her evening.

Kelsey testified that she was "heavily intoxicated" and that she became "aggressive" and "angry" because Mr. Hodge was at Billiards and Brews with Ms. Phillips. Kelsey tried to fight Ms. Phillips, but the Defendant intervened and told her that she needed to leave.

- 6 -

Kelsey's sister then "dragg[ed]" her out of the bar. Kelsey later learned the victim had been killed. She acknowledged that video showed the Defendant using force to restrain her from fighting Ms. Phillips. She said she did not realize he had used force until she saw the video.

On cross-examination, Kelsey acknowledged that she "kind of push[ed]" the Defendant physically and that he put his hands on her arms. She said that the Defendant was trying to keep her from fighting Ms. Phillips and that she did not remember the Defendant having any interaction with the victim.

Kaitlyn Murrell, Kelsey's younger sister, testified that Kelsey and the victim were being affectionate in front of Mr. Hodge. Kelsey later "had words" with Mr. Hodge and tried to fight Ms. Phillips. The victim was with Kelsey initially, but he returned to the dartboards when Kelsey began confronting Ms. Phillips. The Defendant got between Kelsey and Ms. Phillips and was holding Kelsey's wrist, so Kaitlyn told the Defendant not to touch her sister. Kaitlyn then forcefully took Kelsey out of the bar. When they got to their car, Kaitlyn heard a gunshot.

Blake Norman testified that he was in Billiards and Brews on the night of the shooting and that Mr. Ford, who was white, caused a disturbance in the bar by yelling "the N word" to one of Mr. Norman's friends, who was African-American. Mr. Norman's friend and Mr. Ford later ended up getting into a fight in the parking lot. During the melee, Mr. Longmire ran up to Mr. Norman and told him that the victim had been shot. Mr. Norman did not know the victim but went to him. The victim was lying on the ground and did not have a pulse, so Mr. Norman started cardiopulmonary resuscitation. Mr. Norman did not see any weapons.

Justice Hall testified that she and the Defendant were friends in December 2020. They had a sexual relationship, but he was not her boyfriend. After the Defendant was arrested in this case, Ms. Hall and the Defendant continued to communicate. She acknowledged that she recently had spoken with the Defendant on the telephone.

Ms. Hall testified that she was at Billiards and Brews on the night of the shooting and that Kelsey Murrell was "flirting with other people" and "walking around to make sure that [Mr. Hodge] saw her." Ms. Hall did not know the victim but saw him and Kelsey being affectionate. Near closing time, Ms. Hall saw the Defendant push Kelsey and saw Mr. Ford go toward the Defendant.

Over defense counsel's objection, Ms. Hall was allowed to testify that she watched the Billiards and Brews video with defense counsel "a few months" before trial. Ms. Hall acknowledged that the video showed her yelling at Mr. Ford inside the bar. She explained that she was yelling at him because she did not like the way he was approaching the Defendant. Ms. Hall later confronted Mr. Ford in the parking lot and pushed him.

- 7 -

Someone yelled that the victim had been shot, so Ms. Hall went to the victim. She did not see any weapons on the ground, and she did not see the Defendant drive by her.

Ms. Hall testified that she telephoned the Defendant at 2:53 a.m. on December 27 to make sure he was "okay." He said he was "fine." Ms. Hall told the Defendant that someone had been shot, but he did not respond to her statement. At some point after the shooting, Ms. Hall and the Defendant met at a hotel on Strawberry Plains Pike and had sex. She said she could not remember the date of their encounter but that she thought it occurred "before New Year's." The day after Ms. Hall and the Defendant had sex, Investigator Thurman telephoned Ms. Hall and asked her about the Defendant. Ms. Hall did not alert the Defendant that she had been contacted by the police.

On cross-examination, Ms. Hall testified that she talked with the Defendant in the bar on the night of the shooting. He was not intoxicated and "seemed calm, like he usually is." Ms. Hall heard Mr. Ford talking aggressively to the Defendant, but she did not remember what Mr. Ford said. Defense counsel asked if anyone had influenced her testimony, and she said no. Defense counsel asked if she was telling the truth, and she said yes.

Carrie Phillips testified that in December 2020, she was in a romantic relationship with Mr. Hodge. On December 26, Mr. Hodge rode with Ms. Phillips to Billiards and Brews, and the Defendant drove Mr. Hodge's car. Ms. Phillips had never met the Defendant, and she did not know Mr. Hodge had been in a relationship with Kelsey Murrell. Ms. Phillips described the Defendant as "[j]ust an ordinary person that I'd met for the first time, calm, cool, collect[ed] individual."

Ms. Phillips testified that Kelsey became "verbally aggressive" toward her as the night progressed and that Mr. Hodge revealed Kelsey was his ex-girlfriend. Ms. Phillips thought she was going to have to fight Kelsey, but Kelsey ended up being taken out of the bar. After Kelsey left, a skirmish broke out, but Ms. Phillips was not paying attention to it because she was still angry at Kelsey. She said she did not recall people arguing or Mr. Hodge restraining the Defendant.

Ms. Phillips testified that after she and Mr. Hodge exited the bar, she saw an African-American male and a white male fighting in the parking lot. Ms. Phillips did not hear a gunshot, and Mr. Hodge went home with her. Later that morning, Ms. Phillips drove Mr. Hodge to a Wendy's restaurant to meet the Defendant. Ms. Phillips dropped off Mr. Hodge at Wendy's and left. Ms. Phillips acknowledged that the prosecutor contacted her before trial to talk about this case and that she refused to answer his questions.

On cross-examination, Ms. Phillips acknowledged that she met with defense counsel before trial to review the bar video. She said that she was no longer dating Mr.

Hodge, that she had not spoken with the Defendant since the night of the shooting, and that no one had influenced her testimony.

The State called Mr. Hodge to the stand. The State requested that the trial court designate him a hostile witness, and the trial court did so. Mr. Hodge testified that the Defendant was his first cousin, that they grew up playing sports together, and that the Defendant was like a "little brother" to him. In December 2020, Mr. Hodge lived in Pennsylvania and the Defendant lived in California, but they were in Knoxville for the Christmas holidays. On the night of December 26, Mr. Hodge and the Defendant met up with Ms. Phillips, and the three of them went to Billiards and Brews. Mr. Hodge was in a relationship with Ms. Phillips and rode with her to the bar; the Defendant drove Mr. Hodge's silver Ford Fusion. The Defendant had a blue backpack with him. Mr. Hodge thought that the Defendant had a change of clothes in the backpack and that the Defendant put the backpack on the backseat of Mr. Hodge's car. Mr. Hodge was a military veteran, had served in Afghanistan, and suffered from post-traumatic stress disorder. He did not own a gun and did not know the Defendant had a gun.

Mr. Hodge testified that Kelsey Murrell was his ex-girlfriend and that he did not know she was going to be at Billiards and Brews. Kelsey began flaunting her attention to the victim in front of Mr. Hodge and began using profanity toward Ms. Phillips. The victim and Mr. Hodge ended up standing back to back, and Kelsey wanted to fight Ms. Phillips. The Defendant tried to defuse the situation by standing between Mr. Hodge and Kelsey. Kelsey tried to hit Ms. Phillips, so a "bouncer" took Kelsey outside. At that point, people began shouting profanity, which "caused a big commotion" in the bar. Mr. Hodge said that he did not remember Mr. Ford approaching the Defendant, so the State played the video for Mr. Hodge. Mr. Hodge acknowledged that the video showed him positioning himself between the Defendant and Mr. Ford. The video also showed Mr. Hodge putting his hands on the Defendant's shoulder and chest. After the confrontation between the Defendant and Mr. Ford, Mr. Hodge lost sight of the Defendant. Mr. Hodge acknowledged that he was nervous for the Defendant and that he began looking for the Defendant. Mr. Hodge did not see the Defendant exit the bar through a side door.

Mr. Hodge testified that he and Ms. Phillips went outside and that he heard a gunshot. Mr. Hodge saw Mr. Ford in a "big fight" and was worried about the Defendant because the Defendant had just been in a verbal altercation with Mr. Ford inside the bar. Mr. Hodge suddenly saw the Defendant driving Mr. Hodge's Fusion through the parking lot. Initially, Mr. Hodge denied that the Defendant was "speeding." However, he then acknowledged telling Investigator Thurman multiple times that the Defendant was "flying through the parking lot." The Defendant stopped where Mr. Hodge was standing and told him to "get in the car." The driver's window was down, the Defendant was alone, and Mr. Hodge did not see a gun. The Defendant looked "very distraught" and "very scared." Mr. Hodge told the Defendant that he was going home with Ms. Phillips, so the Defendant drove away. Mr. Hodge telephoned the Defendant "to make sure [he was] okay." Mr.

Hodge told the Defendant that he had heard a gunshot, but the Defendant seemed "clueless."

Mr. Hodge testified that he later learned someone had died in the parking lot. He telephoned the Defendant to make sure the Defendant was alright, and they arranged to meet at Wendy's so Mr. Hodge could get his car from the Defendant. When Mr. Hodge arrived at Wendy's, the Defendant was there with two other men in a gold Impala that belonged to Mr. Hodge's grandmother. The Defendant and the two men drove Mr. Hodge to get Mr. Hodge's car. Subsequently, Mr. Hodge and the Defendant had a conversation in which the Defendant told Mr. Hodge that he shot the victim. The Defendant claimed that the victim "came at the car" and that he "felt threatened" by the victim. Mr. Hodge said he also thought the Defendant stated, "I thought [the victim] had a knife." Mr. Hodge told the jury that "[t]hose are my words" and that he could no longer remember exactly what the Defendant said about the victim. The Defendant told Mr. Hodge to paint his car and remove the stickers from the rear window, and the Defendant convinced Mr. Hodge to leave Knoxville.

Mr. Hodge testified that he did not contact the police. On January 5, 2021, Investigator Thurman interviewed Mr. Hodge in Pennsylvania. Mr. Hodge acknowledged telling Investigator Thurman three times that the Defendant claimed he shot the victim because the victim was holding a knife. Mr. Hodge also told Investigator Thurman that he thought the Defendant "could have been bullshitting me."

On cross-examination, Mr. Hodge acknowledged that the Defendant appeared to be in a good mood at Billiards and Brews but that the Defendant "got in [Mr. Ford's] face" when Mr. Ford used a racial slur. The Defendant did not fight Mr. Ford and left the bar.

Mr. Hodge testified that he felt pressured to talk with Investigator Thurman. He spoke with the investigator for more than two hours and provided a DNA sample even though he was not required to do so. Mr. Hodge said that he did not remember why he told Investigator Thurman that the Defendant claimed the victim had a knife. Mr. Hodge told the jury, "I just know [the Defendant] said he felt threatened and [the victim] came at him."

Mr. Hodge acknowledged that he met with defense counsel before trial and that defense counsel "wanted the absolute truth." Defense counsel never gave Mr. Hodge any advice about what to say and never told him not to speak with the State. Mr. Hodge watched the videos with defense counsel in defense counsel's office, which was the first time Mr. Hodge had seen the videos. He acknowledged that after he watched the videos, he thought Investigator Thurman had "misled" him. He also acknowledged that he did not speak with the prosecutor before trial. He said he did not do so because he was "exhausted" and "just wanted the truth to come out in trial." On redirect examination, Mr. Hodge acknowledged that he never used the word "weapon" in his interview with Investigator Thurman.

Officer Jarrett Norman of the KPD testified that he responded to a "shots fired" call at Billiards and Brews at 2:19 a.m. on December 27 and that a lot of people were yelling and screaming in the parking lot. Officer Norman did not see any weapons at the scene. Sergeant Brian Dalton of the KPD testified as an expert in firearms and toolmark identification that the police found one .40-caliber Smith & Wesson cartridge case in the parking lot.

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox County, testified as an expert in forensic pathology that she performed the victim's autopsy and that the victim had one gunshot wound to the left chest. The bullet perforated his heart, tore his left lung, and exited his back. The blood loss due to the heart wound was "very extensive and very quick," and the victim would have lost consciousness within seconds or minutes. Toxicology tests showed alcohol, cocaine, cocaethylene, marijuana, and an antidepressant in his blood, but none of them contributed to his death. Dr. Mileusnic-Polchan did not find any gunpowder on the victim's clothing, so she characterized his gunshot wound as "distant," meaning the muzzle of the gun was more than three feet from him when the gun was fired. She concluded that his cause of death was a gunshot wound to the chest and that his manner of death was homicide.

On cross-examination, Dr. Mileusnic-Polchan testified that cocaethylene was a compound produced in the body when both alcohol and cocaine were present. She said that, depending on the particular gun that was used to shoot the victim, the muzzle of the gun could have been more than two to three feet from him.

Investigator Dylan Williams of the KPD testified that an arrest warrant was issued for the Defendant on the night of January 5, 2021. Investigator Williams began looking for the Defendant via the Defendant's cellular telephone and went to the location of the telephone's "latest ping" but was unable to find him. About noon the next day, Investigator Williams and two other officers met with the Defendant's father and attorney Chloe Akers in the parking lot of East Town Mall.[3] The purpose of the meeting was to advise them that a first degree murder warrant had been issued for the Defendant and that he needed to turn himself in peacefully. After the meeting, Investigator Williams continued trying to locate the Defendant via his cellular telephone. However, Investigator Williams "never got any further pings from his phone activity." Law enforcement arrested the Defendant on January 28, 2021, and found a cellular telephone on his person. Investigator Williams reviewed the data for the telephone, and the data showed that the last ping from the telephone occurred in Knoxville at 10:43 a.m. on January 6.

Richard Francis Qulia, a former agent for the Federal Bureau of Investigation (FBI) and the owner of his own private investigation company, testified for the Defendant that at defense counsel's request, he examined a photograph of the victim's gun and a photograph

---

[3] Ms. Akers was one of the Defendant's attorneys at trial.

of the gun magazine that the police found in the center console of the victim's truck. The gun magazine could hold fifteen rounds, but the photograph showed only fourteen rounds.

Dr. Timothy Allen testified as an expert in psychiatry that cocaine caused a surge of dopamine in the brain, which resulted in a person getting "high." Cocaine also caused an elevated heart rate, heightened senses, and possibly impulsive and aggressive behavior. Dr. Allen explained that smoking crack cocaine or snorting powder cocaine allowed the cocaine to enter the bloodstream directly and that a person who snorted cocaine would feel the effects of the drug in less than one minute. Consuming alcohol and cocaine at the same time created cocaethylene, a metabolite that was much more toxic to the brain and heart than cocaine alone. Dr. Allen said that according to research, people who used alcohol and cocaine together had higher levels of aggression and anger.

Dr. Allen testified that he reviewed video of the victim inside Billiards and Brews. The defense played the video for Dr. Allen in front of the jury, and Dr. Allen said the video showed the victim snorting three "key bumps" of a white powder. Dr. Allen opined that the white powder could have been cocaine because the victim's toxicology report showed cocaine in his system. Dr. Allen described three key bumps of cocaine as "a pretty substantial amount." Soon after the victim snorted the white powder, he exited Billiards and Brews and walked toward his truck. Dr. Allen described the victim's gait as "forceful, aggressive, fast walking." Just one minute, forty-five seconds after the victim snorted the white powder, he encountered the Defendant in the silver car. Dr. Allen said the video showed the victim walking "pretty aggressively" to the driver's side. Dr. Allen acknowledged that he never spoke with the Defendant.

At the conclusion of Dr. Allen's testimony, defense counsel asked if Dr. Allen had formed an expert opinion "as to whether [the victim] was suffering from or dealing with the known side effect of cocaethylene, increased rage or aggression" at the time of the shooting. Dr. Allen responded, "I think all the evidence we have, all this video, my knowledge of this, more likely than not, that's certainly the case."

On cross-examination, Dr. Allen acknowledged that the shooting occurred on a cold night, which could explain why the victim was walking quickly to his truck. He also acknowledged that the research studies he referenced on direct examination involved crack cocaine, not powder cocaine. He said, though, that the effects of crack and powder cocaine on a person were the same.

During closing arguments, the State asserted the following theory of the case: The Defendant got into an altercation with Mr. Ford and was angry when he exited the bar because he had just been "humiliated and insulted" by Mr. Ford. The Defendant planned "to do a drive-by like a coward" and shoot Mr. Ford in the parking lot. As the Defendant was driving through the parking lot, he was "primed and ready": he had the window down on a cold night, and he had the gun "racked and chambered." The Defendant rounded the

corner and encountered the victim. Within seconds, the Defendant decided to shoot the victim.

Defense counsel argued as follows: The Defendant and Mr. Ford never got into an altercation in the bar. Instead, Mr. Ford got into a verbal altercation with another man, and the Defendant got between them to prevent the confrontation from escalating. As the Defendant was later driving through the parking lot, he encountered the victim. The victim, who had just snorted cocaine, approached the car aggressively with his gun in his right hand, and the Defendant shot the victim because he was in fear for his life. Mr. Jackson picked up the victim's gun after the shooting and later put the gun in the victim's bedroom.

The trial court instructed the jury on self-defense, but the jury convicted the Defendant of second degree murder as a lesser-included offense of first degree premeditated murder. At sentencing, the Defendant pled guilty to possession of a weapon by a convicted felon and agreed to be sentenced outside of his range. The trial court sentenced him as a Range I, standard offender to twenty-five years for second degree murder and as a Range III, persistent offender to six years for possession of a weapon by a convicted felon. The trial court ordered that he serve the sentences concurrently and noted that he was statutorily required to serve the twenty-five-year sentence at one hundred percent. *See* Tenn. Code Ann. § 40-35-501(i)(2)(B).

## ANALYSIS[4]

### I. Right to Remain Silent

The Defendant claims that the State infringed on his right to remain silent because the prosecutor was allowed to "highlight" that the Defendant did not talk to his own expert, Dr. Allen, about what occurred on the night of the shooting. The State argues that the prosecutor did not comment on the Defendant's right to remain silent. We agree with the State.

During Dr. Allen's direct testimony, defense counsel questioned him as follows:

Q. Now, Dr. Allen, you have never met with [the Defendant] in this case?

A. No.

Q. Did you need to meet with [the Defendant] in this case to understand or evaluate anything from these videos?

---

[4] We have rearranged the order of the issues presented in the Defendant's brief.

A. No.

Q. Okay. You have, obviously, never treated or knew or were introduced to [the victim]?

A. Correct.

Q. Did you need to do any of those things to evaluate what you just did in this video?

A. No.

On cross-examination, the following colloquy occurred:

Q. Okay. And . . . you've never spoken to [the Defendant]?

A. No.

Q. Okay. And don't you think that the jury, obviously, would want to hear -- you're making an opinion about the victim in this case, right, about his aggressive behavior, right?

A. Yes.

Q. And, yet, you spoke to not one single person who encountered him that night, right?

A. That's true.

. . . .

Q. And so wouldn't you think that it would be important, before you came in and told a jury that this guy's high on cocaine and all aggressive, that you might actually speak to the human being who encountered him?

Defense counsel requested to approach the bench and advised the trial court that "we're getting dangerously close to the defendant's testifying." The trial court offered "to do an instruction," and defense counsel agreed. The trial court instructed the jury:

All right, ladies and gentlemen. Just one caution, the line of questioning's okay. I just want to remind you that the defendant has no burden of proof in the case. He's not required to testify in this matter and

you're to draw no inferences from the fact -- if he chooses not to, you're to draw no inferences from that.

The State resumed questioning Dr. Allen:

Q. So you testified -- or you told the jury, you're coming in here giving them an opinion you're paid for to say that the victim was aggressive, but you've talked to not one single person who encountered the victim on that evening, right?

A. Right.

Q. Including the person who is here on trial and you're here testifying for, correct?

A. True.

Q. Okay. And you don't think that would be important to know that information to form your opinion, right?

A. Well, that wasn't the question I was asked. I was asked to look at the video, look at the Toxicology Reports, look at the information and provide information about cocaine and alcohol and its effects on aggression, and that's what I've done.

The Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution generally provide a privilege against self-incrimination to individuals accused of criminal activity, which includes a right to remain silent. Likewise, the Fifth Amendment "prohibits prosecutorial comment upon a defendant's decision not to testify at trial and precludes a jury from drawing an adverse inference of guilt from a defendant's decision not to testify." *State v. Jackson*, 444 S.W.3d 554, 585 (Tenn. 2014) (citing *Griffin v. California*, 380 U.S. 609 (1965)). This can include the prosecution's indirectly commenting on the constitutional right to remain silent. *Id*. at 587. For example, eliciting a response from a witness, such as a law enforcement officer, about a defendant's post-arrest or post-*Miranda* silence can violate the Fifth Amendment privilege. *See State v. Pender*, 687 S.W.2d 714, 719 (Tenn. Crim. App. 1984); *Honeycutt v. State*, 544 S.W.2d 912, 917 (Tenn. Crim. App. 1976). However, "prosecutorial responses to defense arguments are clearly permitted." *Jackson*, 444 S.W.3d at 587. We review whether a prosecutor's comments violate a defendant's exercise of the constitutional right to remain silent de novo. *Id*. at 588.

Here, it was the defense, not the State, that first questioned Dr. Allen about whether he spoke with the Defendant and whether he thought he needed to speak with the Defendant

- 15 -

in order to form his expert opinion about the victim's behavior. Therefore, the State could follow-up with its own questions to the witness about the issue. Accordingly, we conclude that the State did not violate the Defendant's right to remain silent.

## II. Opinion Testimony

The Defendant claims that the trial court erred by allowing Investigator Thurman to give his opinion for the State but then prohibiting Mr. Qulia from giving his opinion for the defense. The State argues that the trial court did not err. We agree with the State.

## A. Investigator Thurman

Before the State played the videos for the jury, defense counsel argued that Investigator Thurman could identify the witnesses in the videos but that his "editorializing" the videos would be improper because he was not present when the events occurred and, therefore, did not have personal knowledge of the events depicted in the videos. The trial court ruled that it was going to allow the State to "stop at the appropriate points and ask, you know, who are these people? [W]hat does it appear to you that they're doing?" The trial court also said it also was going to instruct the jurors that the videos were the evidence and that the jurors should go by what they saw on the videos, not Investigator Thurman's opinion.

Tennessee Rule of Evidence 602 provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony." Essentially, Rule 602 "provides that a witness is not competent to testify unless he perceived the facts through one or more of the five senses." *State v. Boling*, 840 S.W.2d 944, 949 (Tenn. Crim. App. 1992). As this court has explained:

> In determining whether a witness is competent for purposes of Rule 602, the trial court must determine whether a witness had a sufficient opportunity to perceive the subject matter about which he or she is testifying. Thus, the party offering the testimony must introduce sufficient evidence to support a jury finding that the witness had personal knowledge of the matter.
>
> While the rule fails to define what constitutes "knowledge," the rule does not require "absolute certainty." Nevertheless, the witness/declarant's statement may not be based on mere speculation.

*State v. Land*, 34 S.W.3d 516, 529 (Tenn. Crim. App. 2000) (citing Neil P. Cohen et al., *Tennessee Law of Evidence*, § 602.4, p. 313-14 (3rd ed. 1995)).

"The personal knowledge rule must be considered with other evidence rules in order to determine the admissibility of evidence."  Neil P. Cohen et al., *Tennessee Law of Evidence*, § 602[2], p. 6-28 (6th ed. 2011).  Relevant to this case, Tennessee Rule of Evidence 701(a) provides that a lay witnesses may testify in the form of an opinion when the testimony is "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." Generally, the testimony of a non-expert witnesses must be confined to a narration of the facts based on their first-hand knowledge. *Blackburn v. Murphy*, 737 S.W.2d 529, 531 (Tenn. 1987).  The witness must avoid stating his or her personal opinions, conclusions, or opinions regarding the facts about which they have testified.  *Id.*  An exception to this general rule exists where "such testimony describes observed facts in the only way in which they can be clearly described."  *Id.* at 532 (quoting *National Life & Accident Ins. Co. v. Follett*, 80 S.W.2d 92, 98 (1935)).  This court reviews a challenge to the admission of lay opinion testimony under an abuse of discretion standard.  *State v. McCloud*, 310 S.W.3d 851, 865 (Tenn. Crim. App. 2009).

We recognize that Investigator Thurman was not present when the events occurred at Billiards and Brews.  However, Investigator Thurman watched the videos of what occurred inside and outside the bar from different cameras and had the benefit of watching those videos multiple times.  During his testimony, the State asked him to estimate how many times he watched the videos, and he responded, "I couldn't tell you.  A lot.  I've watched it a lot of times."  From the three indoor cameras, Investigator Thurman had five videos prepared, each one focusing on the actions of Kelsey Murrell, Mr. Ford, Mr. Hodge, the victim, and the Defendant.  He also had one composite video prepared to show the jury all three cameras simultaneously.  Investigator Thurman interviewed witnesses who helped him identify the individuals and the events in the videos.  By viewing the videos with his own eyes multiple times and by speaking with the witnesses, he was able to comprehend what occurred and identify the people involved.

Investigator Thurman's narration of the videos also was helpful to the jury.  The bar was crowded on the night of the shooting, and the cameras inside and outside the bar recorded fluid scenes that involved numerous individuals.  Having studied the videos, Investigator Thurman was able to differentiate between the various participants, point out where they were, and give his opinion about what they appeared to be doing.  He used the word "appears" or "appeared" numerous times.  We note that in our own review of the videos, which did not have any audio and were often grainy, we found his testimony to be extremely beneficial to our ability to identify the witnesses and follow the timeline of events.  On cross-examination, the defense also played the videos for Investigator Thurman and questioned him about what was depicted in the videos.  He acknowledged that some of his opinions could have been interpreted differently, and trial court instructed the jury:

> You know, the video is what the evidence is in here.  Investigator Thurman is just like y'all, he's watching it, too, and making interpretations.

- 17 -

I'm going to let the defense ask about what we're seeing on there. But if you see something different on the video that you interpret it differently, then you go by what you interpret. You know, you're seeing it just as well as he is.

In sum, Investigator Thurman's testimony was rationally based on his own perceptions of the videos and was helpful to the jury. Therefore, we conclude that the trial court did not abuse its discretion by allowing him to give his opinion about the videos.

## B. Mr. Qulia

The Defendant called Mr. Qulia as his first witness. Mr. Qulia testified that he was employed by the FBI for more than thirty-two years before he retired in 2004 and started his own private investigation company. As an FBI agent, Mr. Qulia received specialized training in firearms and ultimately became the principal firearms instructor for agents at the FBI. In 1987, he was transferred to the FBI Academy, where he taught two thousand special agents on the use of revolvers, pistols, shotguns, MP5s, and a variety of other firearms. He also taught members of "SWAT" and the hostage rescue team. In 1992, Mr. Qulia moved to Knoxville and became the principal firearms instructor for FBI agents in East Tennessee until he retired. From 1988 to 2004, he worked mostly with semi-automatic pistols and rifles.

The defense planned to show Mr. Qulia the still photograph of the victim walking to his truck, which defense counsel had introduced into evidence during Investigator Thurman's testimony, and have Mr. Qulia testify as an expert witness that the object in the victim's right hand was consistent with the victim's handgun. The State objected to the proposed testimony, so the trial court sent the jury out of the courtroom and held a hearing.

During the hearing, the defense played the video of the victim walking to his truck. Mr. Qulia acknowledged that he had viewed the video several times. Defense counsel asked him, "And do you see something in [the victim's] right hand?" Mr. Qulia said yes. Defense counsel then showed him the still photograph that was made from the video. Defense counsel asked if Mr. Qulia had been able to review the photograph "as carefully as you can with whatever tools and functions that may be available on these programs?" Mr. Qulia again said yes. Defense counsel asked if the object in the victim's hand had "any characteristics . . . that might be relevant" to this case, and Mr. Qulia said the object "is characteristic of a semi-automatic, full-size pistol." Defense counsel asked if Mr. Qulia could say definitively that the object was or was not a full-size pistol, and Mr. Qulia said no.

Defense counsel then showed Mr. Qulia a photograph of the victim's handgun and a photograph of the gun magazine the police found in the victim's truck. Mr. Qulia said

that the handgun was a full-size .45-caliber pistol and that the magazine found in the truck could hold fifteen rounds. However, the magazine was loaded with only fourteen rounds. Defense counsel asked if the pistol possessed "the characteristics" of the object in the victim's hand, and Mr. Qulia answered, "Yes, it does."

The trial court ruled as follows:

So the Court finds that Mr. Qulia's testimony concerning what is displayed in the video would not substantially assist the trier of fact in determining an issue in this case. The jury can look at that [photograph] just as well as he could. He's got -- there's nothing in the detail of that that would require a firearms expert or a firearms expert could help at all.

His testimony about the magazine holding 15 rounds would be appropriate, based upon his training and experience in firearms. So he can testify to that, but nothing about what's in the video and his interpretation of what's in there being consistent with a handgun.

The Defendant asserts, "What was good for the goose was apparently not good for the gander." In other words, the Defendant thinks it was unfair for the trial court to allow Investigator Thurman to give his opinion about the videos but not allow Mr. Qulia to give his opinion about the photograph. However, testimony by lay opinion witnesses and expert witnesses are governed by different rules of evidence. Relevant to expert witnesses, Tennessee Rule of Evidence 702 provides, "If scientific, technical, or other specialized knowledge will *substantially* assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." (Emphasis added.) "[Q]uestions regarding the admissibility, qualifications, relevancy and competency of expert testimony are left to the discretion of the trial court." *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997) (citing *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993)).

Initially, we note that although the defense intended to call Mr. Qulia as an expert witness, defense counsel apparently forgot to request that he be qualified as an expert in firearms. Accordingly, the trial court never declared him to be an expert witness before the jury. In any event, Mr. Qulia stated only that the object in the victim's hand was consistent with a handgun but that he could not say definitively one way or the other. The trial court ruled that Mr. Qulia's testimony would not substantially assist the trier of fact because the jury could look at the object in the victim's hand in the photograph just like Mr. Qulia. "Generally speaking, the trial court is afforded broad discretion in resolving questions concerning the admissibility of expert testimony; in consequence, we will not overturn its ruling on appeal absent a finding that it abused its discretion." *State v. Ferrell*,

277 S.W.3d 372, 378 (Tenn. 2009). We conclude that the trial court did not abuse its discretion.

The Defendant also contends that the trial court violated his constitutional right to present a defense, which is guaranteed by the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution. *See State v. Brown*, 29 S.W.3d 427, 432 (Tenn. 2000). In many situations, though, the defendant's due process right "must yield to other legitimate interests in the criminal trial process." *Id.* at 432 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). To this end, "[s]o long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007). To determine whether a defendant's due process right to present a defense has been violated by the exclusion of evidence, we must consider:

> (1) Whether the excluded evidence is critical to the defense;

> (2) Whether the evidence bears sufficient indicia of reliability; and

> (3) Whether the interest supporting exclusion of the evidence is substantially important.

*Id.* at 316 (first citing *Brown*, 29 S.W.3d at 434-35; and then citing *State v. Rice*, 184 S.W.3d 646, 673 (Tenn. 2006); *State v. Rogers*, 188 S.W.3d 593, 614 (Tenn. 2006)).

The trial court, following Tennessee Rule of Evidence 702, limited Mr. Qulia's "expert" testimony because the court concluded that the proffered testimony would not substantially assist the trier of fact. However, the trial court allowed Mr. Qulia to testify about the gun magazine. Moreover, during Investigator Thurman's testimony, defense counsel showed him the same photograph that defense counsel showed to Mr. Qulia in the jury-out hearing, and Investigator Thurman said an object was in the victim's right hand. Defense counsel asked if the object could be a gun, and Investigator Thurman responded, "I cannot say for sure what it is." During closing arguments, the defense showed the photograph to the jury and asserted that the object was the victim's pistol. Therefore, the Defendant was able to present his theory that the victim approached the car with a gun, and we conclude that the Defendant's right to present a defense was not infringed by the trial court's limitation of Mr. Qulia's testimony.

### III. Sex With Ms. Hall After the Shooting

The Defendant claims that the trial court erred by allowing evidence that he had sex with Ms. Hall days after the shooting because the evidence violated Tennessee Rule of

Evidence 404(b). The State argues that the Defendant has waived the issue. We agree with the State.

While the State was questioning Ms. Hall on direct examination, she acknowledged that she "previously had a relationship" with the Defendant and that she spent the night with him at a hotel after the shooting. She said she could not remember the exact date they spent the night together. Defense counsel did not object to her testimony. Later in her direct testimony, the following exchange occurred:

Q. Okay. But, nonetheless, after December 27th, when was the next time you laid eyes on [the Defendant]?

A. I don't recall dates. I couldn't tell you what the date was, exactly.

Q. Okay.

A. I believe it was before New Year's, but I can't remember exactly.

Q. But you met up with him?

A. Yes.

Q. And where did you meet up with him?

A. Off Strawberry Plains.

Q. Where at?

A. At a hotel. I don't remember what the hotel was called.

Q. Okay. And where -- what did you do at the hotel there?

A. We had sex.

[Defense counsel]: Your Honor, at this point, I would object and move --

THE COURT: I'm going to overrule the objection.

. . . .

Q. What did you do at the hotel there?

- 21 -

A. We had sex.

Q. Okay. Stayed the night with him?

A. Yes.

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Such evidence may, however, be admitted for other purposes if the following conditions are met prior to admission of this type of proof:

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). "Other purposes" have been defined to include the defendant's motive, intent, guilty knowledge, identity, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. *See State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004). If the trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *State v. Thacker*, 164 S.W.3d 208, 240 (Tenn. 2005) (citations omitted).

The Defendant claims that he preserved plenary review of this issue because he objected to Ms. Hall's testimony. However, defense counsel did not object the first time Ms. Hall testified that she spent the night with the Defendant after the shooting. *See* Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Furthermore, defense counsel did not raise Rule 404(b) as a basis for the Defendant's later objection or request a Rule 404(b) hearing. *See* Tenn. R. Evid. 103(a)(1); Tenn. R. App. P. 36(a). Therefore, we agree with the State that the issue is waived.

## IV. State's Attacking the Integrity of Defense Counsel

The Defendant claims that the prosecutor attacked the integrity of defense counsel during the evidentiary phase of the trial by implying that Ms. Akers, who was one of the attorneys to represent the Defendant at trial and was present during the meeting at East Town Mall, helped the Defendant evade law enforcement and by implying through the State's questioning of Ms. Hall, Mr. Hodge, and Ms. Phillips that defense counsel suppressed their information or caused them to fabricate their testimony. The State argues that the Defendant is not entitled to relief. We agree with the State.

Generally, "[a]dmission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). An abuse of discretion occurs only if "the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning" and admission of the evidence "caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

### A. Meeting at East Town Mall

During the prosecutor's opening statement, he said:

[The police] arrange to meet with [the Defendant's father] at the East Town Mall. And [the Defendant's father] arrives with his attorney, Chloe Akers, at the East Town Mall. And they inform him, we have a first-degree murder warrant for his son. He needs to turn himself in, January 6th.

[The Defendant], then, within 45 minutes -- you're going to see the phone records -- powers off his phone. No more cell site information, no more phone calls, nothing. So his location is then unknown.

In a jury-out bench conference prior to Investigator Williams's testimony, defense counsel objected to his testifying that Ms. Akers attended the meeting at East Town Mall. Defense counsel argued that Ms. Akers was not representing the Defendant or his family at the time of the meeting and that Investigator Williams's testimony about Ms. Akers's

presence "just looks very odd and potentially inappropriate, and it was not." The prosecutor responded that Ms. Akers's attendance at the meeting supported the State's theory that the Defendant knew a warrant had been issued for his arrest and that he was fleeing from the warrant. The trial court stated that "it does make sense to talk about that relationship, that, you know, [Ms. Akers] was there as connection to the family, not as [the defendant's father's] lawyer." Defense counsel requested to put Ms. Akers on the stand for the limited purpose of explaining why she was at the meeting, and the trial court agreed. The trial court also gave defense counsel the option of preparing a stipulation to inform the jury that Ms. Akers was not the family's lawyer at the time of the meeting. Defense counsel responded, "I'd be happy to work up a stipulation."

On direct examination, Investigator Williams testified that after the warrant was issued for the Defendant's arrest, he began looking for the Defendant via the pings from the Defendant's cellular telephone. The next day, Investigator Williams met with the Defendant's father and Ms. Akers at East Town Mall to let them know that a warrant had been issued and that the Defendant should turn himself in to law enforcement. After the meeting, Investigator Williams was unable to receive any information from the Defendant's telephone.

Initially, we question the relevance of Ms. Akers's presence at the meeting. In any event, defense counsel could have presented a stipulation to the jury or put Ms. Akers on the stand to explain why she was at the meeting but never did so. *See* Tenn. R. App. P. 36(a). In any event, the State never suggested or argued to the jury that Ms. Akers communicated with the Defendant after the meeting or that she had anything to do with the Defendant's turning off his telephone to elude capture. In fact, the proof at trial showed that the Defendant turned off his telephone at 10:43 a.m., which was prior to the noon meeting at East Town Mall. Accordingly, we find no merit to this issue.

### B. Ms. Hall, Mr. Hodge, and Ms. Phillips

During Ms. Hall's direct testimony, the trial court allowed her to testify, over the Defendant's objection on the basis of "[w]ork product," that she came to defense counsel's office and that she watched the Billiards and Brews videos with Ms. Akers. Similarly, during Mr. Hodge's direct testimony, the prosecutor elicited that Mr. Hodge met with one of the Defendant's attorneys to go over Mr. Hodge's testimony and to review the videos. The prosecutor asked Mr. Hodge, "And it was then, through that discussion[], that you made some determinations about, in your mind, what had happened in the case?" Mr. Hodge answered, "No sir." The prosecutor continued his line of questioning by asking Mr. Hodge about Mr. Hodge's refusal to speak with the prosecutor before trial. During Ms. Phillips's testimony, the prosecutor began asking her leading questions about their pretrial telephone conversation and her refusal to answer any of his questions. Defense counsel objected, stating that "he's putting himself in the position of the witness, and that's inappropriate." The trial court overruled the objection.

- 24 -

On appeal, the Defendant argues that, while such questioning of the witnesses was not improper per se, the prosecutor was trying to imply that defense counsel improperly used the videos to confuse or influence the testimony of Ms. Hall and Mr. Hodge and that defense counsel improperly advised Ms. Phillips not to speak with the State before trial. The State argues that the Defendant has waived these issues because he did not object to the prosecutor's questioning of Mr. Hodge and because he did not object to the questioning of Ms. Hall and Ms. Phillips on the same basis he raises on appeal. The State also argues that the Defendant has failed to show plain error. In his reply brief, the Defendant asserts that he properly objected to Ms. Hall's testimony and requests that we review the prosecutor's questioning of Mr. Hodge and Ms. Phillips for plain error. We agree with the State that the Defendant has waived these issues and that he is not entitled to plain error relief.

Generally, a defendant's failure to make a contemporaneous objection to testimony waives any issues regarding that testimony. *See* Tenn. R. App. P. 36(a). Moreover, if the defendant does object, it is well-settled that changing the basis for the objection on appeal waives the issue. *See State v. Dooley*, 29 S.W.3d 542, 549 (Tenn. Crim. App. 2000).

In the present case, defense counsel objected to the prosecutor's questioning of Ms. Hall on the basis of "[w]ork product" and objected to the prosecutor's questioning of Ms. Phillips on the basis of "putting himself in the position of the witness." Defense counsel did not object on the basis that the prosecutor was attacking the integrity or ethics of defense counsel. Moreover, defense counsel did not raise any objection to the questions the prosecutor posed to Mr. Hodge. Therefore, we may only review the issues for plain error.

We may consider an issue to be plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Furthermore, the "'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)).

We conclude that the prosecutor's questioning of the witnesses does not rise to the level of plain error because no substantial right of the Defendant was affected and no clear

and unequivocal rule of law was breached. As noted by the Defendant, a prosecutor should not use its questioning of witnesses to attack the integrity and ethical standards of defense counsel. *See United States v. Murrah*, 888 F.2d 24, 27 (5th Cir. 1989) (stating that "the prosecutor may not challenge the integrity and ethical standards of defense counsel unless the prosecutor has certain proof of an offense and the matter is relevant to the case being tried"). However, a common theme in the prosecutor's questioning of Ms. Hall, who had a sexual relationship with the Defendant and was still communicating with him at the time of trial; Mr. Hodge, who had a close relationship with the Defendant and thought of him as a little brother; and Ms. Phillips, who was Mr. Hodge's girlfriend at the time of the shooting and accompanied Mr. Hodge and the Defendant to Billiards and Brews, was that their cooperation with defense counsel but refusal to cooperate with the State showed possible bias in favor of the Defendant. In fact, the State even had Mr. Hodge declared a hostile witness. "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Abel*, 469 U.S. 45, 52 (1984).

Furthermore, even if the prosecutor's questions could be construed as insinuating that the defense was trying to influence the testimony of Ms. Hall, Mr. Hodge, and Ms. Phillips, defense counsel questioned all three of the witnesses about their credibility. None of the witnesses indicated they had been pressured by the defense to change their testimony or testify untruthfully, and Mr. Hodge was allowed to explain why he refused to speak with the prosecutor before trial. Therefore, we conclude that the Defendant is not entitled to plain error relief.

## V. Closing Arguments

The Defendant claims that the prosecutor's closing arguments were improper because the prosecutor (1) speculated about facts of the case that were not in the record, such as when he stated that the Defendant had been "humiliated and insulted" by Mr. Ford; (2) misstated facts presented during the State's case; (3) argued outside Dr. Allen's testimony by comparing powder and crack cocaine to cigarettes and tobacco; (4) shifted the burden of proof to the defense by stating that the Defendant had the "power to subpoena" Mr. Ford; (5) referred to the Defendant as a "coward"; (6) disparaged the defense by claiming that defense counsel "tricked" Mr. Hodge by showing him a "phony" photograph; (7) misled the jury by implying that a duty to retreat precluded the Defendant from acting in self-defense; and (8) made an emotional plea to the jury by stating that the victim's family was going to have "a rough Thanksgiving." The State argues that the Defendant has waived all but two of his claims because he failed to lodge contemporaneous objections and that he is not entitled to relief under either plenary or plain error review. We agree with the State.

It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. *See State v. Carruthers*, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

Improper closing argument occurs when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. *Id*. at 6. Furthermore, "[t]he prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial." *State v. Gann*, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007).

As noted by the State, the Defendant objected only twice during the prosecutor's closing arguments: when the prosecutor stated on rebuttal that defense counsel "tricked" Mr. Hodge by showing him a "phony frame" and when the prosecutor stated on rebuttal that the defense had the "power to subpoena" Mr. Ford. Thus, we will address those two statements first.

## A. "Phony Frame"

In an issue related to the Defendant's previous claims regarding the meeting at East Town Mall and the prosecution's questioning of Ms. Hall, Mr. Hodge, and Ms. Phillips, the Defendant contends that the prosecutor continued to attack the integrity of defense counsel during closing arguments when the prosecutor argued that defense counsel "tricked" Mr. Hodge by showing him the "phony frame" of the victim carrying a gun. The State argues that the Defendant is not entitled to relief because the prosecutor's statement, while "intemperate," was brief and was made "to remind the jury that Mr. Hodge's testimony had been informed by his viewing of the videos, which covered events that Mr. Hodge did not directly observe." We conclude that the prosecutor's statement was improper but that the Defendant is not entitled to relief.

In Mr. Hodge's direct testimony, he stated, "[The Defendant] said he felt threatened. He said [the victim] came at the car, that he was threatened, and my words were, I thought he had a knife. I thought that's what [the Defendant] said." Mr. Hodge then stated that he could not remember if the Defendant used the word "knife." However, Mr. Hodge

acknowledged telling Investigator Thurman three times that the Defendant claimed the victim had a "knife."

On cross-examination, defense counsel questioned Mr. Hodge as follows:

Q. [The prosecutor] asked you if you said to the investigators, [the Defendant] thought he saw a knife, and you kept saying, "those are my words." What are you -- I was confused about that. What do you mean by that?

A. I don't exactly recall it. I just know that [the Defendant] said he felt threatened.

Q. Do you remember that [the Defendant] told you he saw a weapon, he saw a gun?

A. I don't recall.

Q. Why would you say -- I mean, [the prosecutor] asked it. Why would you say a knife? Why not just say a weapon or gun? Do you remember?

A. I don't recall.

That, whatever it might have been, I just know [the Defendant] said he felt threatened and [the victim] came at him.

In the Defendant's closing argument, defense counsel argued to the jury:

Now, Taylor Hodge also said -- and he told these officers -- that "[the Defendant] told me he had a knife." And you heard Taylor. He was worried. 'Cause he gave that some reflection and he tried to back that back some to, "It was a weapon. Those were my words."

. . . .

And he tried to be as complete and honest as he could. And he was honest, even if he was mistaken -- and not mistaken in a malicious or intentional way, but whether he said knife or weapon, honest mistake, even for an Army veteran, but who has now been traumatized again.

The prosecutor responded as follows:

Police tactic 101, you don't feed information to a witness that they then spit out and pair it back to you. You get information from them about what they know. You're not going to sit down with them, like the defense did with every witness, and show the video and then convince them -- like they did with Taylor Hodge somehow, by showing that phony frame . . . saying it was a firearm in his hand[.] . . . It was his keys.

Defense counsel objected and stated, "What he's suggesting the defense did is beyond (inaudible) even for closing arguments." The trial court, responded, "If we focus on the defense arguments, please." Later, the prosecutor argued:

[Mr. Hodge], before he came in here, he had been to the defense attorney's office, reviewed the videotape and found, based on that, that he -- he had been tricked about what the video -- what the video actually showed. And what is it you think that he was shown, the trick? Obviously, the frame of the gun to help his cousin. Because then he comes in here and he tries to back pedal on what he said three different times to Thurman. He told me he thought the guy had a knife. He told me he thought the guy had a knife. He told me he thought that the guy had a knife. And then it [turns] in here to a weapon? But then when remind[ed] every time you talked about it when you were with Investigator Thurman, you used the word knife and that you thought he was bullshitting.

Here, defense counsel argued that Mr. Hodge mistakenly told Investigator Thurman that the Defendant said "knife" and that Mr. Hodge later tried to say the Defendant claimed the victim had a "weapon." However, Mr. Hodge never gave such testimony. Instead, Mr. Hodge testified that while he initially thought the Defendant said the victim had a "knife," he no longer could remember what the Defendant said. Most of the State's rebuttal argument, about which the Defendant now complains, was in response to defense counsel's incorrect argument and to remind the jury that Mr. Hodge told Investigator Thurman not once, not twice, but three times that the Defendant said the victim had a "knife." That said, it was improper for the prosecutor to say that defense counsel "tricked" Mr. Hodge by showing him the "phony frame" of the victim holding a gun.

To warrant a new trial, though, "the argument must be so inflammatory or improper as to affect the verdict." *State v. McCary*, 119 S.W.3d 226, 253 (Tenn. Crim. App. 2003) (citing *Harrington v. State*, 385 S.W.2d 758 (1965)). We review the following factors in determining whether a prosecutor's improper argument affected the verdict to the prejudice of a defendant:

(1) the conduct at issue in light of the facts and circumstances of the case, (2) the curative measures undertaken by the trial court and the prosecution, (3) the intent of the prosecutor in making the improper argument, (4) the

cumulative effect of the improper argument and any other errors in the record, and (5) the relative strengths and weaknesses of the case.

*State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008) (citations omitted).

Again, the prosecutor made his statement in response to defense counsel's incorrect argument about Mr. Hodge's testimony. The trial court instructed the jury in the preliminary instructions and again in the final jury charge that the statements of attorneys are not evidence, and we generally presume that a jury has followed the trial court's instructions. *See State v. Butler*, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). While the prosecutor was trying to disparage defense counsel with the statement, we have found no other errors outside closing arguments.

Finally, the State's case against the victim was strong. Although the Defendant was charged with first degree premeditated murder, which is the premeditated and intentional killing of another, the jury convicted him of second degree murder, which is the knowing killing of another. Tenn. Code Ann. §§ 39-13-201(a)(1), -210(a)(1). Taken in the light most favorable to the State, the evidence shows that the Defendant got into an altercation with Mr. Ford as the bar was closing and that the Defendant was angry as the Defendant was leaving the bar. The Defendant exited a side door as bouncers escorted Mr. Ford out the front door. The Defendant immediately went to Mr. Hodge's car, armed himself with a gun, and drove through the parking lot with his driver's window down on a cold night. The video shows the Defendant driving away from the bar but then speeding up and rounding a corner so that he could drive back toward the bar and where Mr. Ford was standing. In doing so, though, the Defendant suddenly encountered and almost struck the victim, who was walking to his truck. The victim approached the car, held his hands out with his key fob in his right hand, and cursed at the Defendant. The Defendant shot the victim through the heart and fled the scene. Although defense counsel argued that the Defendant feared for his life because the victim approached the car aggressively and was holding a gun in his right hand, the police did not find a gun. Instead, the police found the victim's keys in the parking lot, and his mother found his gun on the nightstand by his bed. Moreover, our careful review of the video confirms that the victim's hands were down by his sides at the time of the shooting. Therefore, the jury reasonably rejected the Defendant's claim of self-defense.

We note that although the Defendant claims on appeal that there was "substantial evidence" to convict him of voluntary manslaughter, he did not argue at any point in the trial that he was guilty of a lesser-included offense. In fact, the parties only addressed first degree murder in their closing arguments, and defense counsel specifically argued that the Defendant was not guilty of any crime, including second degree murder and other lesser-included offenses. Despite that argument, the jury chose to convict the Defendant of second degree murder, demonstrating that the jurors carefully considered the evidence.

The testimony and video evidence strongly support that conviction, and we conclude that the prosecutor's argument did not affect the jury's verdict.

## B. "Power to Subpoena"

Some background on this issue is in order. In the prosecutor's opening statement, he pointed out Mr. Ford in the video and referred to Mr. Ford as "man bun."[5] The prosecutor advised the jury that Investigator Thurman "thinks he knows who [man bun] is" but that "you're going to know who man bun is only by that name." During Investigator Thurman's direct testimony, he stated that he thought "man bun" was Jeffrey Alan Ford. Investigator Thurman said that he began looking for Mr. Ford and that he eventually located Mr. Ford's mother; however, Mr. Ford had left Tennessee, so Investigator Thurman never spoke with him. Despite Investigator Thurman's identifying "man bun" as Mr. Ford, the prosecutor referred to Mr. Ford as "man bun" throughout the trial.

In the Defendant's closing argument, defense counsel stated as follows:

Man bun. Wow, you to want talk about deceptions, mistakes, errors, holes, call it whatever you want. [The prosecutor] -- and please think back to the start of this case. You're going to hear a lot about man bun. We don't know who he is. We're not sure of his name. And then, as the trial progressed, as the examination of Investigator Thurman went on, as the cross-examination of Investigator Thurman went on, we learned he's Jeffrey Alan Ford. We learned a phone number -- that law enforcement had a phone number. We learned that his mother was in town. We learned that he may have been traveling at some point when Investigator Thurman . . . tried to call him. And in the investigator's own words, the only thing they did with Jeffrey Alan Ford, not man bun, was try to call him twice, two times.

On rebuttal, the prosecutor argued:

And the defense made a huge deal about man bun and Jeffrey Alan Ford and me saying that we don't know who he is. Well, Investigator Thurman thinks it's Jeffrey Alan Ford. Jeffrey Alan Ford won't afford himself. And you heard from Investigator Thurman that people do that all the time. There were even security guards that wouldn't cooperate in this case. And you can't make people come in.

And the defense has no burden in any case, but they do have the power to subpoena.

---

[5] The prosecutor apparently chose to identify Mr. Ford by that moniker because Mr. Ford's hair was pulled back into a bun on top of his head.

At that point, defense counsel objected on the basis of "burden shifting" and requested a curative instruction. The trial court stated to the jury, "The basis of the defense objection is to remind you, once again, the defendant has no burden of proof, which is true."

The Defendant argues that the prosecutor's statement about the defense's "power to subpoena" was improper because it shifted the burden of proof to the Defendant. We disagree. The prosecutor made the statement in response to defense counsel's argument that the State made little effort to locate Mr. Ford despite the State's theory that Mr. Ford played a significant role in the victim's death. The prosecutor himself prefaced his statement with "the defense has no burden," and the trial court contemporaneously instructed the jury that the Defendant did not have the burden of proof. The trial court also instructed the jury numerous times in the preliminary instructions and in final jury charge that the State had to prove the Defendant's guilt beyond a reasonable doubt. Therefore, the Defendant is not entitled to relief on this issue.

### C. Prosecutor's Remaining Statements

The Defendant did not object to any other statements made by the prosecutor. As noted by the Defendant, "plain error review is the appropriate standard of review to apply to claims of alleged prosecutorial misconduct during closing argument when no contemporaneous objection was lodged at the time of the alleged misconduct but the claim is raised in the motion for a new trial." *State v. Enix*, 653 S.W.3d 692, 700-01 (Tenn. 2022). As stated previously, we may only find plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*Adkisson*, 899 S.W.2d at 641-42 (footnotes omitted).

First, the Defendant claims that the prosecutor made a "string of speculative claims" when the prosecutor argued to the jury that the Defendant had been "humiliated and insulted" by Mr. Ford, that Mr. Ford had "mimed" shooting a gun at the Defendant when the video showed Mr. Ford simply pointing his finger at the Defendant, and that the Defendant decided to "do a drive-by like a coward." However, the prosecutor's comments went to the State's theory that the Defendant was angry at Mr. Ford when he left the bar and that the Defendant decided to drive by and shoot Mr. Ford. The evidence supported the State's theory. Therefore, the prosecutor's statements were not improper.

In a related argument, the Defendant contends that the prosecutor improperly referred to him as a "coward." The State claims that the prosecutor did not call the Defendant a "coward" but was describing the act of a drive-by shooting as cowardly. As noted by the Defendant, "It is improper for the prosecutor to use epithets to characterize a defendant." *State v. Thomas*, 158 S.W.3d 361, 414 (Tenn. 2005). We agree that the prosecutor did not directly call the Defendant a "coward." Regardless, we do not think the prosecutor's statement was particularly prejudicial. *See State v. Young*, No. W2008-01885-CCA-R3-CD, 2010 WL 161502, at *3 (Tenn. Crim. App. Jan. 15, 2010) (concluding that while prosecutor's calling the defendant a "pervert" was improper, the comment was not so improper as to prejudice the jury's verdict.)

Next, the Defendant claims that the prosecutor made factual errors in his closing argument by saying that Ms. Hall had sex with the Defendant after she spoke with Investigator Thurman when she actually had sex with the Defendant before she spoke with the investigator and by saying that Mr. Hodge told Investigator Thurman that Mr. Hodge thought the Defendant was "bullshitting" when Mr. Hodge actually said that the Defendant "could have been bullshitting." Although the prosecutor may have inaccurately stated that Ms. Hall had sex with the Defendant after she spoke with the investigator, the prosecutor's misstatement was brief, and he did not maliciously misstate the evidence. As we stated previously, the trial court instructed the jury that the counsel's statements are not evidence, and we generally presume that a jury has followed the trial court's instructions. *See Butler*, 880 S.W.2d at 399. Regarding Mr. Hodge's testimony that he thought the Defendant "could have been bullshitting" him, the natural implication was that Mr. Hodge at least had contemplated that the Defendant was lying to him about shooting the Defendant in self-defense. Therefore, the prosecutor's statement that Mr. Hodge thought the victim was bullshitting him was not improper.

The Defendant claims that the prosecutor used an improper analogy by comparing powder and crack cocaine to cigarettes and tobacco. We disagree. Dr. Allen testified for the defense that the victim snorted what appeared to be powder cocaine, that cocaine had a rapid effect on a person when consumed in that manner, and that research showed cocaine could cause aggressive behavior. On cross-examination, Dr. Allen acknowledged that the research involved crack cocaine, not powder cocaine. In his rebuttal argument, the prosecutor stated as follows:

> And the doctor, himself, says all these studies are based on crack cocaine, these aggression studies, and everybody -- it was a common experience, if you're a kid or not, there's a difference between smoking a cigarette and putting a plug of tobacco in your mouth, there's a different way of ingesting things. And he acknowledged that ingesting things nasally or snorting them versus smoking them. Smoking is an immediate effect. There was only 90 seconds between when [the victim] ingested the cocaine and

where they're alleging he became the Incredible Hulk and went into this aggressive rage against the victim. That defies common sense.

The Defendant claims that the prosecutor's analogy went "beyond the record" because there was no evidence about cigarettes and chewing tobacco or the accuracy of the analogy in the record. Taken in context, though, the prosecutor's analogy was an appeal to the jury's experience and common sense with a more-familiar substance, tobacco, that, like cocaine, comes in different forms and can enter the body through different means. We cannot say that such argument was improper. *See State v. Lane*, No. E2017-01907-CCA-R3-CD, 2019 WL 4568053, at *28 (Tenn. Crim. App. Sept. 20, 2019) (prosecutor's equating of fourteen pounds of pressure to items that an average person would be able to relate to was not improper).

The Defendant contends that the prosecutor incorrectly informed the jury that the Defendant had a "duty to retreat" before he could act in self-defense when the Defendant actually had "a duty to retreat *if possible to do so safely*." However, immediately after the prosecutor told the jury that the defendant had a duty to retreat, the prosecutor said that "the Judge is going to instruct you on that." During the jury instruction on self-defense, the trial court instructed the jury that the Defendant had a duty to retreat "to the extent, that it can be done so -- or to be done in safety." Although incomplete, the prosecutor's statement about self-defense was not improper.

Finally, the Defendant claims that the prosecutor made an improper "emotional plea" to the jury. During Mr. Hodge's cross-examination, defense counsel asked him about his family. Mr. Hodge acknowledged that the Defendant's case was "ripping [their] family apart" and was "an absolute tragedy that [his] family is dealing with." In the prosecutor's preliminary closing argument, he said:

> You know, there was a lot of talk about Taylor Hodge up here about, you know what, dividing his family and how his family -- you know, it's going to be a rough Thanksgiving for Taylor Hodge, right? 'Cause he testified against his cousin. Well, how would you like to be that family in Iowa at Thanksgiving? It's going to be [a] rough Thanksgiving there, too, because of the decisions that he made to take a human life, 'cause he was hacked off. Prearmed himself for this very event.

The State argues that the prosecutor was not making an emotional plea to the jury but was reminding the jury that the victim's family also was suffering due to the Defendant's actions. In light of Mr. Hodge's cross-examination testimony, we agree with the State and conclude that the prosecutor's statement was not improper. *See Duff v. State*, No. E2017-01757-CCA-R3-PC, 2018 WL 5305052, at *10 (Tenn. Crim. App. Oct. 25, 2018) (concluding that prosecutor's closing statements were properly based on testimony given

at trial). Additionally, considering all of the prosecutor's statements cumulatively, we conclude that the Defendant is not entitled to plain error relief.

## VI. Jury Instructions

The Defendant raises several issues regarding the jury instructions. "It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001) (citations omitted). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)).

An erroneous jury instruction may deprive the defendant of his constitutional right to a jury trial. *State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000). As part of their instructions in criminal cases, trial courts must describe and define each element of the offense or offenses charged. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. *Id.* (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)). "Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness." *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014).

### A. Duty to Retreat

The Defendant contends that the trial court erred by instructing the jury that he had a duty to retreat before acting in self-defense because there was no nexus between his unlawful possession of a weapon and his need to engage in self-defense. The State argues that the trial court properly instructed the jury on self-defense. We agree with the State.

After the State rested its case and while the jury was out of the courtroom, the trial court and the parties discussed the self-defense instruction. The State produced certified copies of the Defendant's prior felony convictions in California for inflicting corporal injury. The State noted that the prior convictions specifically prohibited the Defendant from possessing firearms and that the prior convictions supported count two of the presentment for possession of a firearm after having been convicted of a violent felony.

Pursuant to *State v. Perrier*, 536 S.W.3d 388 (Tenn. 2017), the trial court found that the Defendant was engaged in the unlawful conduct of possessing a firearm when he shot the victim. The trial court then stated as follows:

> And I also find that it has a direct nexus to this incident here, because it was the unlawful conduct, that where he had a gun in his possession, that was

- 35 -

connected to the murder -- or the killing, I should say, of -- of [the victim]. And so it's not like he was recklessly driving through the parking lot and that -- or speeding down Interstate 40. So I do find that, under *Perrier*, he was engaged in unlawful conduct that was -- had a nexus to this event.

Thus, the trial court included the following language in the jury instruction on self-defense:

> In this case, the law of self-defense requires the defendant to have employed all means reasonably in his power, consistent with his own safety, to avoid danger and avert the necessity of taking another's life. This requirement includes the duty to retreat in this case, if, and to the extent, that it can be done so -- or to be done in safety.

At the time of the offenses, Tennessee Code Annotated section 39-11-611(b)(2) provided:

> Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity[6] and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> > (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
> >
> > (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
> >
> > (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b) (2018).

In *Perrier*, our supreme court held that the trial court, as part of its threshold determination of whether to charge self-defense,

> should decide whether to charge the jury that a defendant did not have a duty to retreat. As part of that decision, the trial court should consider whether the State has produced clear and convincing evidence that the defendant was

---

[6] This portion of the statute now reads "not engaged in conduct that would constitute a felony or Class A misdemeanor . . . ." Tenn. Code Ann. § 39-11-611(b)(2) (2021).

- 36 -

engaged in unlawful activity such that the "no duty to retreat" instruction would not apply.

*Id*. at 403. The court further held that a defendant's possession of a firearm as a convicted felon was encompassed within the "unlawful activity" contemplated by the statute. *Id*. at 404.

The supreme court in *Perrier* found it unnecessary to address whether the unlawful activity by a defendant had to have a causal nexus to the defendant's perceived need to defend himself. *Id*. Subsequently, though, a panel of this court held in *State v. Booker*, No. E2018-01439-CCA-R3-CD, 2020 WL 1697367, at * 44 (Tenn. Crim. App. Apr. 8, 2020), *rev'd in part on other grounds*, (Tenn. Nov. 18, 2022), that there must be a causal nexus "between a defendant's unlawful activity and his or her need to engage in self-defense" and that "status offenses" "will rarely qualify as unlawful activity because a person's status alone cannot provoke, cause, or produce a situation." *Booker*, 2020 WL 1697367, at *27; *see also State v. Simpson*, No. M2021-01031-CCA-R3-CD, 2022 WL 16544456, at *15 (Tenn. Crim. App. Oct. 31, 2022).

The Defendant, relying on *Booker*, contends that while his possession of a firearm may have been unlawful, "there was no nexus between the unlawful act and the 'need to engage in self-defense.' That is, on the facts here, the confrontation between [the Defendant] and [the victim] was not, in any way, caused by [the Defendant's] unlawful possession of a firearm." We disagree.

Initially, we note that "*Booker* is not controlling and other panels of this court have not followed the same analysis." *State v. Newson*, No. M2021-00444-CCA-R3-CD, 2022 WL 2251303, at *9 (Tenn. Crim. App. June 23, 2022) (citing *see, e.g., State v. Sales*, No. M2017-01116-CCA-R3-CD, 2020 WL 5568621, at *15 (Tenn. Crim. App. Sept. 17, 2020)), *perm. app. denied*, (Tenn. Nov. 16, 2022). That said, we conclude that a causal nexus existed in this case. The Defendant was angry after his altercation with Mr. Ford and armed himself with the firearm to confront Mr. Ford. As the Defendant was driving through the parking lot, he spotted Mr. Ford, who had already managed to get himself into another altercation on the other side of the parking lot. The Defendant sped up and rounded a corner to make a U-turn so he could drive toward Mr. Ford, but the Defendant almost hit the victim. The victim held his hands out, moved from the front of the car to the driver's door, and cursed the Defendant. The Defendant, sitting in a car with the engine running, could have driven away. Instead, he shot the victim through the heart. The Defendant's arming himself with a loaded gun and making the gun immediately accessible as he sped through the parking lot to confront Mr. Ford was the causal nexus between the unlawful act and the Defendant's allegedly needing to defend himself. Therefore, the trial court properly instructed the jury that the Defendant had a duty to retreat.

## B. Modified Sequential Instruction

The Defendant claims that the trial court erred by denying his request for a modified sequential jury instruction because, if a jury follows the pattern sequential instruction on second degree murder and voluntary manslaughter, the jury can never find a defendant guilty of voluntary manslaughter. The State argues that the trial court did not err. We agree with the State.

Second degree murder is "[a] knowing killing of another," and voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. §§ 39-13-210(a), -211(a). Before trial, the defense filed a motion, requesting that the trial court instruct the jury:

> In connection with second-degree murder, even should you find the defendant guilty beyond a reasonable doubt of a knowing or intentional killing, before you may return a verdict of guilty for that offense, you must first consider whether the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner. If you conclude that the evidence demonstrates that the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner, then you shall return a verdict of guilty of voluntary manslaughter.

During a discussion about the instructions, defense counsel reiterated that if the jury followed the pattern sequential instruction, "they'll never get to voluntary." The trial court responded,

> My remedy for that -- and the pattern, what we came up with is to put in the second-degree, that -- the difference between those two. I really think this is a Legislative fix. I think the Legislature's going to have to come in and define second versus voluntary in a different way. But this is the way I always do it. I put the -- I put the distinction paragraph in with second-degree murder, so they would have seen it before they ever go down to voluntary.
>
> And so I'm going to deny the request. I understand it. And I've ruled on it 100 times. And I get it, but I think it's the best way to instruct it.

During the final jury charge, the trial court instructed the jury on first degree premeditated murder. The trial court then instructed the jury on second degree murder and voluntary manslaughter as follows:

- 38 -

If you have a reasonable doubt as to the defendant's guilt of first-degree murder, as charged in this Presentment, then your verdict must be not guilty as to this offense, and then you shall proceed to determine his guilt or innocence of second-degree murder, a lesser-included offense.

Any person who commits second-degree murder is guilty of a crime. For you to find the defendant guilty of this offense, the State must have proven, beyond a reasonable doubt, the existence of the following essential elements:

(1) that the defendant unlawfully killed Brandon Lee; and

(2) that the defendant acted knowingly.

Knowingly means that a person acts with an awareness that his conduct is reasonably certain to cause the death of the alleged victim.

The requirement of knowingly is also established if it is shown the defendant acted intentionally, as defined above under first-degree murder.

The distinction between voluntary manslaughter and second-degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation from the alleged victim sufficient to lead a reasonable person to act in an irrational manner.

And Voluntary Manslaughter is the next lesser.

If you have a reasonable doubt as to the defendant's guilt of second-degree murder, a lesser-included offense, then your verdict must be not guilty as to this offense, and then you shall proceed to determine his guilt or innocence of voluntary manslaughter, a lesser-included offense.

Any person who commits voluntary manslaughter is guilty of a crime. For you to find the defendant guilty of this offense, the State must have proven, beyond a reasonable doubt, the existence of the following essential elements:

(1) that the defendant unlawfully killed Brandon Lee; and

(2) that the defendant acted intentionally or knowingly; and

(3) that the killing resulted from a state of passion produced by adequate provocation from the alleged victim sufficient to lead a reasonable person to act in an irrational manner.

Passion means any of the emotions of the mind reflecting anger, rage, sudden resentment, terror or similar feelings rendering the mind incapable of cool reflection.

After the trial court instructed the jury on all of the lesser-included offenses, the trial court gave the following instruction on the order of consideration:

In reaching your verdict, you shall, first, consider the offense charged in the Presentment. If you unanimously find the defendant guilty of that offense beyond a reasonable doubt, you shall return a verdict of guilty for that offense. If you unanimously find the defendant not guilty of that offense or have a reasonable doubt of the defendant's guilt of that offense, you shall then proceed to consider whether or not the defendant is guilty of the next lesser-included offense in order from greatest to least within that Count of the presentment. You shall not proceed to consider any lesser-included offense until you have first made a unanimous determination that the defendant is not guilty of the immediately preceding greater offense or you unanimously have a reasonable doubt of the defendant's guilt of that offense.

If you have a reasonable doubt of the guilt of the defendant as to all offenses charged and included in that Count of the Presentment, you shall return a verdict of not guilty.

The Defendant asserts that he is not challenging the acquittal-first instruction itself, which our supreme court approved in *State v. Davis*, 266 S.W.2d 896 (Tenn. 2008), but that he is challenging "the fact that here the acquittal first instruction was combined with a so-called lesser-included offense that (contrary to the traditional meaning of a lesser included) actually has more elements rather than fewer elements. That combination produces the unfair and nonsensical result in this case."

As noted by the Defendant, a panel of this court expressed concern over this very issue in *State v. Donaldson*, No. E2020-01561-CCA-R3-CD, 2022 WL 1183466 (Tenn. Crim. App. Apr. 21, 2022), *cert. denied*, 143 S. Ct. 2504 (2023). As that panel explained:

The problem occasioned by treating passion induced by provocation as an element [of voluntary manslaughter] that must be proved by the State is compounded by the acquittal-first jury instruction, which, completely appropriate in nearly every other situation, acts as a practical barrier to the jury's consideration of voluntary manslaughter as a lesser included offense

of first or second degree murder.  Once the jury finds that the defendant has committed a knowing killing, it cannot move on to consider voluntary manslaughter as a lesser included offense if it follows the pattern jury instruction.  Moreover, the additional instruction to the jury that it should consider the difference between the two offenses does little to break down this barrier given that it does not actually guide the jury's consideration.  Additionally, that instruction is sandwiched between two others that specifically prohibit consideration of the offense of voluntary manslaughter before the jury has decided on the offense of second degree murder.

*Donaldson*, 2022 WL 1183466, at *24.

However, despite those concerns, this court has repeatedly rejected claims that sequential jury instructions precluded the jury from finding the defendant guilty of voluntary manslaughter, particularly when, as here, the trial court informed the jury about the difference between second degree murder and voluntary manslaughter immediately after the trial court instructed the jury on second degree murder.  *See State v. Moore*, No. E2015-00585-CCA-R3-CD, 2016 WL 2865759, at *15 (Tenn. Crim. App. May 12, 2016) (rejecting defendant's argument that sequential instructions prevented jury from finding him guilty of voluntary manslaughter because jurors were informed of difference between second degree murder and voluntary manslaughter "at the moment" they were considering guilt for second degree murder"); *State v. Hale*, No. M2008-00872-CCA-R3-CD, 2009 WL 1658696, at *11 (Tenn. Crim. App. June 15, 2009) ("trial court's instruction regarding second degree murder noted the distinction between voluntary manslaughter and second degree murder relative to voluntary manslaughter"); *State v. Clark*, No. W2007-00651-CCA-R3-CD, 2009 WL 890886, at *13 (Tenn. Crim. App. Apr. 1, 2009) (same).

The jury instructions on second degree murder and voluntary manslaughter in this case mirror the statutory definitions of the lesser-included offenses and are almost identical to the pattern jury instructions for second degree murder and voluntary manslaughter.  *See* Tenn. Code Ann. §§ 39-13-210(a)(1), -211(a); 7 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 7.05(a), 7.06(a).  This court previously has found the language in the pattern instructions to be "clear and unambiguous."  *Moore*, 2016 WL 2865759, at *10; *see also State v. Billie Jo Welch*, No. E2005-02293-CCA-R3-CD, 2006 WL 2737830, at *14 (Tenn. Crim. App. Sept. 26, 2006); *State v. Ezell Wallace*, No. W2002-00266-CCA-R3-CD, 2003 WL 21643219, at *16 (Tenn. Crim. App. July 14, 2003).  The trial court did not err by denying the requested instruction.

### C.  Voluntary Manslaughter

The Defendant claims that the trial court improperly instructed the jury on voluntary manslaughter because the instruction included "state of passion" as an essential element of the offense that the State must prove beyond a reasonable doubt when "state of passion" is

actually a defense to second degree murder that, if fairly raised by the proof, must be disproved by the State beyond a reasonable doubt. The State argues that the trial court properly instructed the jury on voluntary manslaughter. We agree with the State.

In *State v. Williams*, 38 SW.3d 352, 538 (Tenn. 2001) (quoting Tenn. Code Ann. §39-13-211(a) (1997)), our supreme court stated that "the essential element that now distinguishes [second degree murder and voluntary manslaughter] (which are both "knowing" killings) is whether the killing was committed '"in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner."'" However, in *Donaldson*, the panel closely examined *Williams* and determined that:

> [w]hen placed in proper context, the holding in *Williams* cannot be understood to hold that passion induced by provocation became an essential element of the offense of voluntary manslaughter following the 1989 amendment because such treatment would have been a fundamental departure from the historical understanding of the offense. To hold that the *Williams* court intended to deem passion induced by adequate provocation an essential element to be proven by the State is to say that the court intended to turn on its head the historical underpinning of the offense of voluntary manslaughter by way of a single sentence unaccompanied by any analysis of the historical treatment of evidence of passion induced by provocation.

2022 WL 1183466, at *23.

Since *Donaldson*, though, another panel of this court has observed that:

> appellate courts "in Tennessee have consistently held that state of passion produced by adequate provocation is an essential statutory element of the offense of voluntary manslaughter and not a mere defense to second degree murder." *Paul Clifford Moore, Jr.*, 2016 WL 2865759, at *14 (citing cases); *see State v. Christopher W. Gadsden*, No. M2019-01385-CCA-R3-CD, 2020 WL 6791251, at *7 (Tenn. Crim. App. Nov. 19, 2020), *perm. app. denied* (Tenn. Mar. 17, 2021); [*State v. William Langston*, No. W2015-02359-CCA-R3-CD 2017 WL 1968827, at *13 (Tenn. Crim. App. May 12, 2017)].

. . . .

> [I]n opinions released both prior to and after the release of . . . *Donaldson*, this court has recognized that state of passion produced by adequate provocation cannot be treated as a partial defense to second degree murder unless or until the Tennessee Supreme Court or the legislature expressly authorizes such treatment. *See*, *e.g. State v. Jeffrey Lee Potts*, No. M2020-

01623-CCA-R3-CD, 2022 WL 2348233, at *20 n.5 (Tenn. Crim. App. June 29, 2022); *William Langston*, 2017 WL 1968827, at *13; *Paul Clifford Moore, Jr.*, 2016 WL 2865759, at *13; [*State v. Khaliq Ra-El*, No. W2013-01130-CCA-R3-CD, 2014 WL 3511038, at *6 (Tenn. Crim. App. July 11, 2014)]). In light of the plain statutory language, designating "state of passion produced by adequate provocation" as an element of the separate offense of voluntary manslaughter rather than a partial defense to second degree murder, and the Tennessee Supreme Court's decision in *Williams*, recognizing the provision as an "element" of voluntary manslaughter, we likewise conclude that "state of passion produced by adequate provocation" cannot be treated as a partial defense to second degree murder until authorized by the legislature or the Tennessee Supreme Court.

*State v. Hamilton*, No. E2021-00409-CCA-R3-CD, at *20 (Tenn. Crim. App. Sept. 28, 2022), *cert. denied*, 144 S. Ct. 502 (2023).

As this court stated in *Hamilton*, we are bound to follow published case law by our supreme court. Our supreme court stated in *Williams* that "state of passion produced by adequate provocation" is an essential element of voluntary manslaughter. We note that this court has repeatedly requested that our supreme court address this issue. *Donaldson*, 2022 WL 1183466, at *23 ("stating that "[o]ne need only conduct a brief survey of the plethora of cases on this issue after *Williams* to understand that the law is not nearly well-settled. We would ask, as other panels have done since as early as 2004, that our supreme court address this issue"). Yet, our supreme court has not yet done so. Therefore, we conclude that the trial court properly instructed the jury that "state of passion" is an element of voluntary manslaughter. As such, it was the State's burden to establish state of passion beyond a reasonable doubt. *Id.* at *21 (citing *White*, 362, S.W.3d at 566). The Defendant is not entitled to relief.

## VII. Cumulative Error

Finally, the Defendant claims that he is entitled to relief under the cumulative error doctrine, which is:

a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial. To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings.

*State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (citations omitted).  Here, the only error we found was in the prosecutor's closing argument.  Therefore, we conclude that the Defendant is not entitled to relief based on cumulative error.

## **CONCLUSION**

Upon our review, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE